IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

DIMUROGINSBERG, P.C., *et al.*, )
)
           Plaintiffs, )
)
         v. )     Case No. 1:18-cv-1046 (AJT/TCB)
)
VLOX, LLC, *et al.*, )
)
           Defendants. )
_____ )

## MEMORANDUM OF DECISION AND ORDER

Plaintiffs DiMuroGinsberg, P.C. ("DMG") and Artabane & Belden, P.C. ("Artabane"),

Virginia and D.C. law firms, respectively, have not been paid for legal services provided to

Defendants VLOX, LLC ("VLOX") and Starwalker PR, LLC ("Starwalker"). VLOX and

Starwalker are government contract companies owned and controlled by Defendant Hamed

Wardak ("Wardak"), who, Plaintiffs allege, used those companies as his alter ego and, through

improper transfers to himself, deprived those entities of any ability to satisfy their outstanding

bills.  Plaintiffs seek judgments against all three Defendants for their billed fees and costs,

together with punitive damages, pre- and post-judgment interest, injunctive relief as to certain

transferred assets, and reasonable attorneys' fees and costs incurred in pursuing this litigation.

The Defendants allege that they had a representation agreement only with Artabane and

therefore do not owe DMG any fees or costs, that the amount billed by Artabane is unreasonable

in light of the work performed, that Wardak's distributions to himself were proper, that he

properly maintained corporate formalities as to VLOX and Starwalker, and that he therefore has

no personal liability for any fees and expenses due and owing.

In their five-count Amended Complaint, Plaintiffs assert claims for Breach of Contract (Count I), *Quantum Meruit* (Count II), Fraud in the Inducement (Count III),[1] Corporate Veil Piercing (Count IV), and Fraudulent Transfer (Count V). *See* [Doc. 34]. The Court held a bench trial on those claims on June 4 and 5, 2019 and heard closing arguments on June 13, after which the Court took the matter under advisement. As directed, the parties have submitted their proposed findings of fact and conclusions of law. By way of summary, the Court finds and concludes the following:

(1) Both DMG and Artabane had a valid representation agreement with VLOX and Starwalker.

(2) $92,299.80 is a fair and reasonable amount for the legal services and expenses provided by DMG.

(3) $242,440.40 a fair and reasonable amount for the legal services and expenses provided by Artabane.

(4) The equities favor an award of prejudgment interest in favor of Plaintiffs.

(5) The veil piercing of VLOX is appropriate as to Wardak; and Wardak is personally liable, jointly and severally, with VLOX and Starwalker, for the judgments entered in this case.

(6) Wardak's transfer of assets from VLOX and Starwalker and from Starwalker to himself, while fraudulent conveyances, do not under all the circumstances warrant an award of equitable relief to the Plaintiffs;

Accordingly, the Court finds in favor of the Plaintiffs on Count I (breach of contract) and Count IV (corporate veil piercing) and will enter judgments as follows:

---

[1] Plaintiffs abandoned their Fraudulent Inducement claim at trial.

1.  in favor of Plaintiff DMG and against Defendants VLOX, Starwalker, and Wardak, jointly and severally, in the amount of $92,299.80, with interest at the rate of 6% as of May 13, 2016;

2.  in favor of Plaintiff Artabane and against Defendants VLOX, Starwalker and Wardak, jointly and severally, in the amount of $242,440.40, with interest at the rate of 6% as of May 13, 2016; and

3.  in favor of Defendants on Counts II (*Quantum Meruit*), Count III (Fraudulent Inducement), and Count V (Fraudulent Transfer).

In further support of this verdict, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[2]

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. Findings of Fact[3]

Based on the evidence presented at trial, including the Court's assessment of the credibility of the witnesses, the weight to be given each piece of evidence, and the reasonable inferences to be drawn from that evidence, the Court makes the following findings of fact:

1.  DMG is a Virginia law firm located in Alexandria, Virginia. Artabane is a Washington D.C. law firm. All DMG attorneys who performed legal work for VLOX in this matter are Virginia attorneys, and Joseph Artabane, the only Artabane attorney who performed legal work for VLOX in this matter, is a Washington D.C. attorney.

2.  Mr. Artabane performed his work for VLOX at DMG's offices in Alexandria, Virginia.

3.  Wardak resides in Dorado, Puerto Rico.

---

[2] Federal Rule of Civil Procedure 52(a) provides: "In an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately. The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

[3] The Court's findings of fact are included both within this section and also as stated in the Conclusions of Law.

4. VLOX is a District of Columbia limited liability company wholly owned by Wardak, its sole member. VLOX began operations as NLC Construction, LLC. In June 2008, NLC Construction, LLC changed its name to NCL Holdings, LLC. On February 1, 2011 NCL Holdings, LLC changed its name to VLOX. VLOX operated without a board of directors since 2009.

5. Starwalker is a Puerto Rico limited liability company wholly owned by Wardak, its sole member.

6. In 2012, VLOX retained DMG to represent it before the United States Court of Appeals for the Fourth Circuit in connection with an appeal from a judgment in the amount of $2,814,034.12 entered against it in favor of Mirzada Transport & Logistics Co. ("Mirzada") and related collection discovery by Mirzada with respect to that unpaid judgment. VLOX and DMG signed a written engagement letter dated December 4, 2012 in connection with that representation.

7. The engagement letter stated DMG partner Ben DiMuro's rate at $450 per hour, the rate for DMG associates at $300 per hour, the rate for DMG paralegals at $75 per hour, and the rate for law clerks at $100 per hour. By its terms, the representation letter applied only to the Fourth Circuit appeal, although the letter did say that "[w]e would, of course, be happy to discuss further representation on a mutually agreeable basis after the Fourth Circuit issues its final decision." [Doc. 101-15].

8. In April 2013, while this representation was ongoing, the parties began discussing DMG's potential representation of VLOX in an action to enforce the terms of a contract VLOX had with the Army to provide shipping services in Afghanistan before the Armed Services Board of Contract Appeals ("ASBCA") in Falls Church, Virginia ("the HNT Contract").

9. Wardak viewed himself as the ultimate owner of the HNT Contract; and the HNT Contract dispute centered on amounts owed under two provisions: the "base year demurrage" provision and demurrages under the "first year option" provision, which were being pursued in two separate appeals before ASBCA.

10. At that time, DMG did not have an attorney on staff who specialized in government contract matters and therefore referred VLOX to Artabane, who specialized in this area.

11. From April to September 2013, VLOX was bidding on another matter and chose not to pursue the HNT Contract claims while bidding on that project. Therefore, the parties did not reach a formal agreement for Artabane to represent VLOX until after that bidding and selection process was completed, which occurred by September 2013. VLOX did not win the bid, and discussions about Artabane's representation of VLOX on the HNT Contract matters resumed in earnest in September 23, 2013.

12. Those discussions pertaining to Artabane's representation took place over a series of telephone calls and emails between VLOX and Plaintiffs. Artabane initially quoted an hourly rate of $650; but at DiMuro's request, quoted a reduced hourly rate of $550. Neither Mr. Artabane nor DiMuro informed defendants how often they would be billed.

13. In a September 2013 conference call on which Mr. Artabane, DiMuro, and Wardak were present, Wardak verbally approved the rate of $550 per hour for Artabane and retained Artabane to represent VLOX on the HNT Contract matters, including both the base year demurrage appeal, which had already been filed by VLOX's former counsel, Smith Pachter and was still pending, and the first-year option appeal.

14. As a result of their discussions and agreements, Defendants had an express representation agreement with Artabane.

15. Artabane began working on both claims in September 2013, but initially focused primarily on the base year claim. DMG attorneys did not initially perform work on the base year claim. However, Artabane began focusing on the option year claim in early 2014, at which time DMG also began working on the option year claim.

16. Throughout DMG's involvement in the option year representation, Wardak and other VLOX personnel interacted with DG attorneys and never questioned DMG about its involvement or work.

17. In 2014, Bill Ruhling, a lawyer who had significant government contract experience, joined DMG and began to work on the option year settlement and backhaul litigation. Before Ruhling began work on those matters, Mr. Artabane and Ruhling called VLOX COO Muffaddal Kothari and introduced Ruhling to him. VLOX employees and officials, including Kothari, Melissa Bulluck (VLOX's Executive Vice President), and Wardak, were aware that Ruhling was employed by DMG and was working on the option year settlement and backhaul matters and never questioned or objected to his work.

18. DMG associate Matt Lafferman also performed work for VLOX on the option year matter and backhaul litigation. VLOX and Wardak were aware that Lafferman was a DMG attorney; and no VLOX employees or officials, including Wardak, ever questioned or objected to his performing legal services.

19. In multiple emails, correspondence concerning settlement negotiations, draft complaints, and documents related to discovery were exchanged between Ruhling and Lafferman from DMG and Bulluck and other VLOX employees, with copies to Wardak.

20. Based on their discussions and activities, Defendants had an implied-in-fact representation agreement with DMG; and at the time this agreement was reached, Defendants intended to pay Artabane and DMG for their representation.

21. In the Base Year Demurrage claim, VLOX sought more than $4 million for demurrage incurred pursuant to the HNT Contract. Artabane negotiated a settlement in principal for $3.125 million in December 2013, which, after Government setoffs for amounts owed by VLOX to the Government, netted approximately $2.7 million to VLOX.

22. Once the Base Year settlement was reached, Plaintiffs performed substantial work to facilitate payment of the settlement funds, which occurred on November 17, 2014. In that regard, VLOX's bank refused to accept funds wired to VLOX by the Government in payment of the settlement; and Mr. Artabane facilitated the ultimate receipt of those payments by VLOX by assisting VLOX in updating its "cage codes," registering with the Government, and getting a new bank account that could receive the settlement funds.

23. In December 2014, following VLOX' receipt of the $2.7 million in settlement funds, Wardak caused VLOX to transfer $2 million to Wardak's personal account. Wardak did not pay any consideration to VLOX for this transfer and has characterized it as a distribution to him as VLOXX's sole member.

24. At the time of the $2 million transfer from VLOX to Wardak, the Mirzada judgment remained outstanding as well as other outstanding liabilities separate and apart from the Mirzada judgment. VLOX ceased to maintain an open, operating bank account since late 2014, shortly after it received the Base Year settlement funds; and VLOX no longer has any assets to pay its currently outstanding liabilities.

25. While working on facilitating payment of the Base Year settlement, Plaintiffs began work on the Option Year Demurrage claim.

26. As part of the Option Year claim, Plaintiffs engaged in extensive discovery (including obtaining and reviewing GPS "pings" from a Northern Virginia contractor and assembling the administrative record on appeal), separating the various demurrage claims into

"batches," litigating a motion for reconsideration of the contracting officer's denial of the claim as to one batch, filing an appeal to ABSCA as to all of the batches, litigating a motion to dismiss the appeal for lack of jurisdiction, litigating a partial summary judgment motion, and engaging in lengthy settlement negotiations.

27. In July 2015, Plaintiffs negotiated, on behalf of VLOX, a settlement in principal in the amount of approximately $27.4 million—the full amount of the combined batches. The settlement was finalized in November 2015.

28. Wardak formed Starwalker on January 26, 2015; and then had VLOX assign its rights in the HNT Contract to Starwalker on the same day. VLOX retained its liabilities. Wardak admits that he formed Starwalker in part because Mirzada had a judgment against VLOX.

29. After the HNT Contract settlement agreement was reached, Plaintiffs learned that VLOX had, at Wardak's direction, assigned its rights under the HNT Contract to Starwalker on January 26, 2015.[4]

30. The Government's approval of VLOX's assignment of the HNT Contract to Starwalker was required under the Assignment of Claims Act and accompanying regulations; Defendants had not obtained the Government's approval before making the assignment; and in order to facilitate payment of the settlement, Plaintiffs had to obtain the Government's approval after the fact. Plaintiffs also assisted Starwalker in opening a bank account in which to receive the $27.4 million settlement payment from the Government. The settlement funds were paid to Starwalker on March 3, 2016.

31. **[Redacted]**

32. **[Redacted]**

---

[4] VLOX had attempted to transfer its rights under the HNT Contract to Starwalker on January 21, 2015, but Starwalker had not yet been formed.

33. At the time of VLOX's assignment of the HNT Contract to Starwalker, VLOX had no bank accounts; Starwalker had no source of income, VLOX never received [redacted], or any other amount, from Starwalker for the assignment; and Wardak has never transferred any monies to VLOX for its assignment of the HNT Contract to Starwalker.

34. Plaintiffs also submitted a claim for backhaul payments under the Base Year of the HNT Contract on behalf of Starwalker and, after the contracting officer failed to issue a final decision on the claim, filed an appeal to the ASBCA.

35. During its representation of VLOX and Starwalker, DMG prepared monthly invoices for its fees and expenses and sent those invoices to Artabane. Artabane did not exercise any billing discretion over DMG invoices, but did not forward those invoices to VLOX or Wardak until May 13, 2016.

36. On September 1, 2015, Defendants requested an invoice during the pendency of the Option Year settlement, but Artabane did not send any bills to Defendants until after the Option Year settlement funds had been paid. Given the status of settlement discussions at the time, and the legal work necessary to finalize that $27.4 million Option Year settlement, providing an invoice for fees to date on September 1, 2015 would not have caused VLOX, Starwalker, or Wardak to terminate the representation of DMG or Artabane or to direct that Artbane and/or DMG not perform any of the work ultimately billed.

37. On April 29, 2016, Wardak caused Starwalker to transfer $27 million to Wardak's personal account without any consideration, a transaction Wardak characterizes as a "distribution," although neither VLOX nor Starwalker had an operating agreement governing distributions.

38. On May 13, 2016, after the payment on March 3, 2016 of the $27.4 Option Year settlement, Artabane sent invoices for his work and DMG's work. The cover letter included with the invoices identified Artabane's work separately from DMG's work, and the DMG invoices were printed separately and provided on separate letterhead from Artabane's invoices. Artabane charged Defendants $243,815.40 in attorneys' fees and costs, and DMG charged $92,299.80 in attorneys' fees and costs. The fees were based on the hourly rates that Wardak had previously approved; and the hourly rates and costs submitted by both Artabane and DMG were necessary and reasonable for lawyers of comparable experience and ability in the Northern Virginia area.

39. On May 17, 2016, Defendants, through Kothari, acknowledged receipt of these invoices and indicated that they would review them. In the same message, Defendants terminated the representation of both Artabane and DMG and ultimately retained new counsel to proceed with the backhaul claim; and Defendants have not paid any of the billed fees or expenses.

40. At all material times herein, Wardak viewed VLOX and Starwalker's funds as inseparable from his own personal funds. Although he characterized as distributions the respective $2 million and $27 million transfers from VLOX and Starwalker to his personal account after the Base Year and Option Year settlements, [redacted]. At the time of these transfers to Wardak, VLOX and Starwalker had outstanding liabilities to creditors.

41. Although VLOX and Starwalker hired independent accountants to keep the companies' books, prepare their taxes, and advise them on compliance with corporate law, Wardak closely managed VLOX and Starwalker's financial affairs and, as the corporations' CEO and sole member, was ultimately responsible for their finances, tax filings, and corporate governance.

42. Starwalker does not have any assets, and Wardak has funded Starwalker's operations, including its pursuit of its remaining backhaul claims, from his own personal funds since Starwalker transferred the $27 million Option Year settlement proceeds to Wardak.

43. **[Redacted]**

44. In effecting the above described transactions, Wardak disregarded corporate formalities, used his dominion and control over VLOX and Starwalker to undervalue the transfer of an asset, and allowed VLOX and Starwalker to become underfunded in the face of outstanding liabilities.

45. VLOX and Starwalker do not adhere to corporate formalities and do not maintain any corporate documents other than those required to be filed to remain in good standing in the District of Columbia (VLOX) and Puerto Rico (Starwalker). VLOX and Starwalker also do not conduct corporate meetings and do not maintain corporate minutes, bylaws, or other corporate documents.

46. VLOX has had no employees since 2015, and Starwalker currently has only two employees, one of whom is Wardak. Neither VLOX nor Starwalker has any current sources of income.

47. Since the Option Year settlement was paid, Starwalker's primary business activity has been pursuing payment on the contract assigned to it by VLOX.[5]

48. There is a unity of interest between Wardak and VLOX, and VLOX is Wardak's alter ego.

## II. Conclusions of Law
### A. Breach of Contract

In Virginia, "[p]arties may agree to an express contract, whether orally or written, to govern their course of dealing." *Spectra-4, LLP v. Uniwest Commercial Realty, Inc.*, 772 S.E.2d 290, 293 (Va. 2015). In the absence of an express contract, an implied contract may exist. *City*

---

[5] Pl. Ex. 31 at ¶10.

*of Norfolk v. Norfolk Cnty.*, 91 S.E. 820, 822 (Va. 1917). Two types of implied contracts are recognized in Virginia: implied-in-fact contracts and implied-in-law contracts. *Id.* Implied-in-fact contracts are no different from express contracts except that, instead of "all of the terms and conditions [being] expressed between the parties, . . . some of the terms and conditions are implied in law from the conduct of the parties." *Hendrickson v. Meredith*, 170 S.E. 602, 605 (Va. 1933). "Like an express contract, an implied-in-fact contract is created only when the typical requirements to form a contract are present, such as consideration and mutuality of assent." *Spectra-4*, 772 S.E.2d at 295. However, "an implied-in-fact contract is arrived at by a consideration of the parties' acts and conduct." *Id.* (quotation and alteration omitted).

Regardless of whether a contract was express or implied, "[t]he elements of a breach of contract action are (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Ramos v. Wells Fargo Bank, NA*, 770 S.E.2d 491, 493 (Va. 2015) (internal quotation marks omitted) (quoting *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

As to Artabane, the Defendants do not dispute that there was an oral agreement that Artabane would represent VLOX in the HNT Contract matters and that they agreed upon a rate of $550 per hour. It is also undisputed that Defendants have failed to pay any legal fees to Artabane, and that Artabane has therefore suffered an injury in the form of uncompensated legal fees. Thus, the only dispute is over how much Artabane is entitled to recover. In that regard, Defendants argue that the delay in billing prevented them from knowing what fees were being generated and had they known they would have acted to reduce the services provided or terminate the representation. They also argue that the fees they were incurring and that the hours expended were unreasonable in light of the amount of work performed and the complexity of the

issues. Based on these contentions, they argue that a substantial reduction in Artabane's legal fees is warranted.

At trial, both parties presented expert witnesses to testify as to the reasonableness *vel non* of Artabane's invoices. The Court credits the opinion testimony of Plaintiffs' expert witness, Antonio R. Franco, Esq. Franco is an experienced government contract attorney in the Washington, D.C. area who testified that overall, Artabane's bills for the Base Year and Option Year demurrage claims were reasonable and appropriate.[6] The Court has also reviewed the lodestar analysis employed by Mr. Franco and finds that it accurately reflects the prevailing rates of comparable attorneys in the region and a proper analysis of the hours billed.

In addition, the Court has independently reviewed all of the circumstances of the representation and the work performed and finds the billed amounts reasonable. Although Defendants argue that the representation involved essentially litigating only two motions, the partial summary judgment motion in the Option Year claim involved extensive discovery before the motion and extensive settlement negotiations afterward, followed by considerable efforts to convince the Government to pay the settlement in light of VLOX's assignment of its assets to Starwalker. Similarly, Artabane engaged in extensive negotiations with the Government in obtaining the Base Year settlement and performed additional work after the settlement was reached to effectuate payment to VLOX. **[Redacted].**

Given the prospects of a $27 million settlement that had materialized as of mid-2015, it is unreasonable to think that had Artabane provided an interim bill in September 2015, defendants would have jeopardized that settlement by directing the Plaintiffs to stop or reduce the work Plaintiffs thought necessary to consummate the settlement that had been reached in principle.

---

[6] A contrary view was presented by Defendants' expert, whose law firm has charged the Defendants over $500,000 for post-trial briefing in the Backhaul Litigation.

While Artabane's billing practices were not ideal, they did not cause any injury or prejudice to the Defendants.

In summary, Plaintiffs have established all of the elements of their breach of contract claim as to Artabane, and that the total amount billed by Artabane, $243,815.40, is reasonable under all of the circumstances of the case. The Court has therefore awarded that amount with the exception of certain entries, identified at trial, that were either misbilled or too vaguely described to allow for adequate evaluation, resulting in an overall award of $242,440.40.

As to DMG, and as stated above, an implied-in-fact contract existed between DMG and VLOX. DiMuro was involved in the representation from the beginning and was present on multiple initial calls and emails, and VLOX and Wardak were aware of his involvement and interacted with him. Further, as Artabane began to press the Option Year claim in early 2014, multiple VLOX employees, including Wardak, were aware that Lafferman and Ruhling were extensively involved in that claim and VLOX employees corresponded with them and discussed various aspects of their work. Moreover, Lafferman and Ruhling's correspondence all included a DMG signature block. No VLOX employee, including Wardak, ever questioned or objected to these DMG attorneys' roles in the representation. This course of conduct amply meets the requirements of an implied-in-fact contract.

The parties' course of conduct does not, however, demonstrate that they agreed that DMG would represent VLOX under the same terms and conditions contained in DMG's 2012 representation letter in the Mirzada litigation. "[A]n implied-in-fact contract may include only the particular terms of a previously expired express contract which the parties' subsequent actions, embodying their mutuality of assent, specifically encompass." *Spectra-4*, 772 S.E.2d 290 at 296. There is no evidence that the parties ever discussed their prior engagement letter during their discussions about the HNT Contract matters, and their subsequent dealings establish

only that there was an agreement that DMG would assist Artabane in litigating those matters. Nevertheless, for essentially the same reasons that it found Artabane's invoices reasonable, the Court finds and concludes that the rates invoiced by DMG were reasonable for DMG's role in the representation and the work it performed. *See Seagram v. David's Towing & Recovery, Inc.*, 62 F. Supp. 3d 467, 477 (E.D. Va. 2014) ("[W]here a contract has been formed based on the parties' conduct, but nothing has been said regarding compensation, the law provides that the person who performs the services shall be paid for the reasonable value of the work performed." (citing *Mangold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009))).

The Court also credits the opinion and testimony of Franco that DMG's invoices were reasonable and has independently reviewed DMG's invoices in light of the total circumstances of the case, and concludes that the rates requested were reasonable and appropriate for the Northern Virginia region and the labor expended reasonable and necessary.

Accordingly, the Court finds that DMG has proven all of the elements of its breach of contract claim and that the damages sought represent the reasonable value of the services rendered to Defendants on the HNT Contract matters. The Court will therefore award $92,299.80 to DMG.

**B. *Quantum Meruit***

Because the Court finds and concludes that a valid express contract existed between Defendants and both Artabane and DMG, Plaintiffs cannot recover under their alternatively pleaded *quantum meruit* claim. *See Mongold v. Woods*, 677 S.E.2d 288, 292 (Va. 2009) ("[F]or a court to award a *quantum meruit* recovery, the court must conclude that there is no enforceable express contract between the parties covering the same subject matter."). Accordingly, the Court enters judgment in favor of Defendants as to Count II.

## C. Corporate Veil Piercing

The veil-piercing analysis is governed by the law of the state of incorporation, *see, e.g.,* *United States v. Kolon Indus., Inc.*, 926 F. Supp. 2d 794, 815 (E.D. Va. 2013). VLOX is a Washington, D.C. LLC, so D.C.'s veil-piercing law applies as to it. In the District of Columbia, "[g]enerally, the corporate entity will be respected, but a party may be permitted to pierce the corporate veil upon proof that there is (1) unity of ownership and interest, and (2) use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it." *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008) (quotations omitted). "In determining whether the corporation is the alter ego of its shareholders, the court will consider various factors, such as (1) whether corporate formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled with personal assets, (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect personal business from the claims of creditors." *Id.* at 470–71 (quotation omitted).

As to Starwalker, Puerto Rico's corporate laws apply, because Starwalker is a Puerto Rico LLC. Under Puerto Rico law, "a plaintiff hoping to persuade a court to pierce the corporate veil must establish that the directors acted with intent to defraud *and* that the creditor cannot collect from the corporation the debt owed them." *Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 322 (D.P.R. 1996) (emphasis added) (citing *Fleming v. Toa Alta Development Corp.*, 96 P.R.R. 234 (P.R. 1968). "Additional evidence must be offered which would lead to the conclusion that the corporation has been established or that its business has been managed for the purpose of defrauding." *Fleming*, 96 P.R.R. at 244.

Plaintiffs have met their burden of proof to show that the corporate veil should be pierced as to VLOX. As to the first requirement of the District of Columbia test, there was clearly a unity of ownership and interest between VLOX and Wardak. Wardak was the sole member and

CEO of VLOX, made all financial decisions, and viewed himself as "the ultimate owner of the [HNT] contract." His sole control of VLOX establishes unity of ownership. *See Virginia Elec. & Power Co. v. Peters*, 2018 WL 1995523, at *3 (E.D. Va. Apr. 27, 2018) (finding that a defendant's "role as . . . president, owner, and sole shareholder establishes a unity of ownership"). As to the second requirement, the Court finds that justice and equity require veil piercing under the circumstances of this case. Wardak transferred $2 million of the Base Year settlement from VLOX to himself without paying any consideration and was aware that this transfer would result in VLOX's undercapitalization and lack of funds to pay its then-creditors. Specifically, VLOX owed, and still owes, a judgment of approximately $2.8 million to Mirzada. VLOX nevertheless transferred its rights under the HNT Contract—its only source of income— to Starwalker yet did not transfer any liabilities to Starwalker. Further, Wardak admitted that he formed Starwalker—and by implication that he transferred VLOX's rights under the HNT Contract to Starwalker—in part because of the Mirzada judgment, and he knew at the time of the transfer that a settlement in principal had been reached that would result in a payment of more than $27 million, which could have satisfied VLOX's outstanding obligations with millions to spare, yet **[redacted]**. Indeed, he essentially disabled VLOX from engaging in any financial transactions since he caused it to close its bank accounts shortly after he transferred the majority of the Base Year settlement to his personal account. Moreover, VLOX does not have any assets, receive any income, or have other means with which to pay its creditors, even though **[redacted]**. VLOX has not retained any employees and does not maintain corporate documents aside from those required to remain in good standing or conduct corporate meetings. Thus, if the Court were to enter judgment against VLOX only, it does not appear that VLOX would have the ability to pay the judgment, or even if it somehow does, that Wardak would authorize VLOX to

do so, and that the judgment would remain unpaid, like VLOX's outstanding Mirzada judgment, which has remained unpaid for more than six years.

Based on all of these facts, the Court concludes that Plaintiffs have satisfied their burden of proving the elements of their veil-piercing claim under D.C. law as to VLOX, and that veil piercing is warranted under the facts and circumstances of the case. The Court therefore enters judgment against Wardak personally, as well as VLOX and Starwalker. Because the Court enters judgment against Wardak personally on the basis of VLOX, it need not and does not address the propriety of veil piercing as to Starwalker under Puerto Rico law.

### D. Fraudulent Transfer

In Count V, Plaintiffs argue that Wardak transferred the Base Year and Option Year settlement proceeds to himself with the intent to avoid paying VLOX and Starwalker's legal bills. In Virginia, "[a] creditor seeking to void a conveyance as fraudulent must prove, by clear, cogent and convincing evidence, that: 1) the grantor intended to delay, hinder or defraud his creditors, and 2) the grantee had notice of the grantor's fraudulent intent." *La Bella Dona Skin Care, Inc. v. Belle Femme Enterprises, LLC*, 805 S.E.2d 399, 404 (Va. 2017).

Based on all the evidence, the Court concludes that the transfers of the HNT Contract from VLOX to Starwalker and the $27 million Option Year settlement from Starwalker to Wardak were fraudulent transfers as to VLOX's creditors. The Court does not conclude, however, that under all the circumstances, an award of equitable relief is warranted or necessary as to these Plaintiffs, since the evidence is insufficient to establish by clear and convincing evidence that Wardak's transfers of the settlement funds were made with the intent to avoid paying VLOX and/or Starwalker's legal bills.

VLOX received the $2.7 million in settlement proceeds from the base year demurrage claim settlement in November 2014, and Wardak withdraw $2 million the following month. At

that time, Artabane had not billed VLOX for any services, and Wardak left approximately $700,000—enough funds to cover those bills—in VLOX's account at the time. As to the $27 million in proceeds of the option year demurrage settlement that Wardak transferred to himself on April 29, 2016, Artabane had still not billed VLOX or Starwalker, and Starwalker apparently retained approximately $400,000 in its account—enough to pay both Starwalker and VLOX for the fees they would eventually bill the following month. Moreover, Wardak subsequently put a significant amount of funds back into Starwalker after he made the distribution and after he received Artabane and DiMuroGinsberg's bills, including **[redacted]**. Although it is undisputed that Wardak formed Starwalker and transferred VLOX's rights under the HNT Contract to Starwalker in part because VLOX had the Mirzada judgment against it, and although the Court finds, for reasons discussed previously, that the so-called "distributions" to Wardak's personal account were essentially intermingled VLOX and Starwalker funds for the purpose of the veil-piercing claim, the Court finds that there is not "clear, cogent, and convincing" evidence that the *transfer* of either group of settlement proceeds, rather than the formation of Starwalker itself or the assignment of the HNT Contract rights to Starwalker, was made with the subjective intent to avoid payment of the Plaintiffs' outstanding legal fees. *See La Bella Dona Skin Care*, 805 S.E.2d at 404.

### E. Punitive Damages

Plaintiffs only seek punitive damages in connection with their fraudulent inducement claim in Count III. Because Plaintiffs abandoned Count III at trial, there is no remaining basis upon which to award punitive damages.

### F. Injunctive Relief

In their Amended Complaint, Plaintiffs request the Court to "[e]njoin Wardak to return and the corporate Defendants to recover monies fraudulently conveyed to Wardak." [Doc. 34 at

22]. Because the Court finds in favor of Defendants as to Plaintiffs' fraudulent transfer claim in Count V, there is no basis for awarding injunctive relief by virtue of any fraudulent transfer on Defendants' part. Moreover, in Virginia, injunctive relief is only warranted where there is both irreparable injury and inadequacy of legal remedies. *See Wright v. Castles*, 349 S.E.2d 125, 129 (Va. 1986) (observing that an injunction "is an extraordinary remedy" and that to obtain an injunction, a party must prove that "he would suffer irreparable harm if the injunction were not granted and that he did not have an adequate remedy at law"); *Yancy v. Fenwick*, 14 Va. 423, 423–24 (Va. Super. Ch. 1809) ("[T]his Court can only give relief, where the law affords none; unless the party asking for it, could not avail himself at law . . . ."). Here, as discussed, the Court enters judgment against VLOX, Starwalker, and Wardak personally; and Plaintiffs have failed to show that their harm was irreparable or that this monetary judgment would not be an adequate remedy. The Court therefore denies Plaintiffs' request for injunctive relief.

### G. Attorneys' Fees and Costs

In Virginia, as a general rule, a court may not award attorneys' fees to the prevailing party unless a statute or the contract at issue so authorizes. *Gilmore v. Basic Industries, Inc.*, 357 S.E.2d 514, 517 (Va. 1987). However, there are a number of exceptions: a prevailing party in a malicious prosecution or false imprisonment case, a party to a contract who was forced to maintain or defend a suit with a third party as a result of a contracting party's breach, a trustee who defended its trust in good faith, prevailing parties in certain alimony and support cases, and a defrauded party who proves such fraud may all recover attorney's fees. *Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 300–01 (Va. 1999) (collecting cases).

The Court finds that no statute, contract, or recognized exception applies that allows for Plaintiffs' recovery of attorneys' fees in this case. There is no statute allowing for recovery in a breach of contract case or legal fee dispute; and although Plaintiffs argue that both Artabane and

DMG's representation of VLOX in the HNT Contract matters was governed by the prior 2012 engagement letter VLOX had with DMG for representation in the Mirzada litigation. That engagement letter provided that "[i]n the event of the client's non-payment, the client shall further be obligated to pay all attorney fees and costs related to collection." However, the Court finds that although the engagement letter contemplated the possibility of potential additional representation in the future, it nowhere stated that its terms would apply to such future representation. Moreover, there is no evidence to suggest that the parties agreed that the HNT Contract representation would be governed by the 2012 engagement letter. To the contrary, Mr. Artabane never saw that letter until after an agreement was reached for him to represent VLOX in the HNT Contract matters, and the parties never discussed that engagement letter in the September 2013 conference call in which Wardak approved the representation. Accordingly, the 2012 representation letter governing the Mirzada litigation is not a proper basis on which to award attorneys' fees and costs to Plaintiffs.

Furthermore, no judicially recognized exception to the general rule against attorneys' fees applies. As discussed, Plaintiffs have not prevailed on their fraudulent inducement claim, which, if proven, would have allowed the Court to award attorneys' fees in its discretion. *See Bershader*, 515 S.E.2d 291, 300–01. And while Plaintiffs' cite the Virginia Supreme Court's decision in *Bershader* in support of their argument that attorneys' fees may be awarded if a defendant engaged in a "scorched earth" litigation strategy, *Bershader*'s holding was that attorneys' fees may be awarded in the court's discretion only in a case in which fraud was proven. *Id.* at 301 ("We hold that in a fraud suit, a chancellor, in the exercise of his discretion, may award attorney's fees to a defrauded party. When deciding whether to award attorney's fees, the chancellor must consider the circumstances surrounding the fraudulent acts and the nature of the relief granted to the defrauded party."). The *Bershader* court only considered the

defendants' litigation tactics as a factor in determining whether the trial court abused its discretion in awarding attorneys' fees—discretion that the trial court possessed only because the plaintiffs had first proven fraud. *Bershader* thus does not provide an independent exception for awarding attorneys' fees against a party who has engaged in "scorched earth" litigation in a contract case in which fraud has not been proven.

### H. Interest

The final remaining issue is Plaintiffs' request for prejudgment interest. Under the Virginia Code, a district court "may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Va. Code § 8.01–382. A decision to award prejudgment interest under the Virginia Code is within the sound discretion of the trial court. *See, e.g., Hannon Armstrong & Co. v. Sumitomo Trust & Banking Co.*, 973 F.2d 359, 369 (4th Cir. 1992); *Dairyland Ins. Co. v. Douthat*, 449 S.E.2d 799, 801 (Va. 1994). In exercising its discretion, a court "must weigh the equities in a particular case to determine whether an award of prejudgment interest is appropriate." *Moore Bros. Co. v. Brown & Root, Inc.*, 207 F.3d 717, 727 (4th Cir. 2000). If the judgment is based on a contract that does not fix an interest rate, the court shall apply the judgment rate of interest of six percent to calculate any award of pre-judgment interest pursuant to § 8.01-382 as well as post-judgment interest. Va. Code § 6.2-302(B).

Although DMG's 2012 engagement letter provided for prejudgment interest, as discussed, that engagement letter did not govern Plaintiffs' representation of Defendants in the HNT Contract matters and thus does not provide a basis for awarding prejudgment interest. *See supra* Part II.H. However, the Court still retains discretion to award prejudgment interest if it finds it is so warranted based on the facts of the case, and, based on all of the facts and circumstances of this contract case, the Court concludes that the equities favor an award of

prejudgment interest to Plaintiffs, to commence on May 13, 2016, the date on which Plaintiffs submitted their invoices to Defendants. *See Jones v. Williams*, 6 Va. 102, 106 (1799) ("[I]nterest is allowed, because it is natural justice that he who has the use of another's money should pay interest for it."); *see also J.W. Creech, Inc. v. Norfolk Air Conditioning Corp.*, 377 S.E.2d 605, 608 (Va. 1989) (quoting *Jones* with approval).

### III. Conclusion

As set forth above, based on the evidence at trial, reasonable inferences drawn therefrom, and the Court's assessment of the weight to be given to that evidence, the Court issues its verdict in favor of

Accordingly, it is hereby

ORDERED that with respect to Plaintiffs' Count I (Breach of Contract) and Count IV (Corporate Veil Piercing), judgment be, and the same hereby is, ENTERED in favor Plaintiff DiMuroGinsberg, P.C. and against Defendants VLOX, LLC, Starwalker PR, LLC, and Hamed Wardak, jointly and severally, in the amount of $92,299.80, with interest accruing from May 13, 2016 until paid at the rate of 6% per annum; and it is further

ORDERED that with respect to Plaintiffs' Count I (Breach of Contract) and Count IV (Corporate Veil Piercing), judgment be, and the same hereby is, ENTERED in favor Plaintiffs Artabane & Belden, P.C. and against Defendants VLOX, LLC, Starwalker PR, LLC, and Hamed Wardak, jointly and severally, in the amount of $242,440.40, with interest accruing from May 13, 2016 until paid at the rate of 6% per annum; and it is further

ORDERED that with respect to Plaintiffs' Count II (*Quantum Meruit*), Count III (Fraudulent Inducement), and Count V (Fraudulent Transfer), judgment be, and the same hereby is, ENTERED in favor of Defendants VLOX, LLC, Starwalker PR, LLC, and Hamed Wardak

and against Plaintiffs Artabane & Belden, P.C. and DiMuroGinsberg, P.C.; and those claims, be and the same hereby are, DISMISSED.

The Clerk is directed to forward copies of this Order to all counsel of record; and to enter judgments in accordance with this Order pursuant to Federal Rule of Civil Procedure 58.

_____

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
August 7, 2019